No. 93,622

LSF Franchise REO I, LLC, *Plaintiff/Appellant*, v. Emporia Restaurants, Inc., and North Star Holdings of Missouri, L.L.C., *Defendants*, and Polaris Restaurants, Inc., *Defendant/Appellee*.

(152 P.3d 34)

Opinion filed February 2, 2007.

*Thomas A. Krueger*, of Krueger Law Offices, of Emporia, argued the cause and was on the briefs for appellant.

*Cynthia F. Grimes*, of Grimes & Rebein, L.C., of Lenexa, argued the cause, and *Jeffry J. Larson*, of Miller & Larson, Chtd., of Emporia, was with her on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: LSF Franchise REO I, LLC (LSF), filed a nonearnings garnishment action attempting to collect on its civil judgment against Polaris Restaurants, Inc. (Polaris). The trial court granted Polaris' motion to quash the garnishment of two bank accounts

held in Polaris' name, ruling that the accounts were held in trust for withholding taxes and not subject to garnishment. The Court of Appeals affirmed the trial court's ruling. *LSF Franchise Reo I v. Emporia Restaurants*, 35 Kan. App. 2d 189, 130 P.3d 1212 (2006). We granted LSF's petition for review and now reverse.

*FACTS*

In September 2003, LSF filed a "Petition to Foreclose Mortgage and for Other Relief" against defendants Emporia Restaurants, Inc., Polaris Restaurants, Inc., and North Star Holdings of Missouri, LLC. A journal entry of judgment and foreclosure was entered for LSF against the defendants on March 18, 2004, for over $2,600,000. In an effort to collect this judgment, LSF filed on July 23, 2004, a request for a nonearnings garnishment on Commerce Bank (Commerce), with whom LSF believed that Polaris held accounts. On July 28, 2004, Commerce answered the order, stating that "$33,686.73 IS THE AMOUNT GARNISHEE IS HOLDING."

Commerce amended this answer on August 3, 2004, stating that Polaris had two checking accounts with Commerce as of the date of service of the order of garnishment: Account No. 49 and Account No. 50, both titled in Polaris' name. Neither account was "special" or specifically held apart for a particular purpose, although Account No. 50 had the description " 'Payroll Account' " in its address line.

Commerce's answers to interrogatories explained that, at the time of service, Account No. 49 had a balance of $24,069.66. However, two items deposited in that account totaling $17,400 were returned for insufficient funds after the service of garnishment, leaving a balance of $6,669.66 in Account No. 49. Similarly, Account No. 50 had a balance of $9,617.07 at the time of service of the garnishment order. Two deposits were also returned from that account, totaling $7,200, leaving a balance of $2,417.07 in Account No. 50 as of August 3, 2004. According to Commerce's amended answer, Polaris' combined balance from the two accounts available to be garnished was $9,086.73.

On August 9, 2004, Polaris filed a "Motion to Quash Garnishment," alleging that at the time of service of the order of garnishment, Account No. 49 consisted of its "operating funds" and Account No. 50 consisted of "earned wages and payroll taxes known as a payroll account." Polaris stated that it had scheduled for payroll taxes in the amount of $8,791.64 to be taken out of its payroll account via electronic funds transfers, and that it was its "intent to transfer the funds from the operating account to the payroll account to cover the electronic funds transfers for payroll tax purposes." The electronic funds transfer was denied after the order of garnishment was served on Commerce.

Polaris alleged that the correct tax amount owed was $8,791.64 ($8,610.28 for 941 [employment] taxes and $181.36 for 940 [unemployment] taxes). LSF apparently understood the total taxes due to be $8,610.28. The trial judge made no finding as to the amount due, and the record contains no documentation or other evidence as to the dollar amount of taxes due.

Polaris expressed no objection to garnishment of its operating bank account (Account No. 49), "exclusive of those funds necessary to satisfy the payroll taxes." Using the figure of $8,791.64, the balance in the operating account, after deduction for taxes, would be $297.11. However, Polaris did object to any garnishment of the payroll account, Account No. 50, because it asserted that "the funds in such account do not constitute the property or assets of Defendant." According to Polaris, the earned wages were the property of its employees, and the payroll taxes were held for the federal and state taxing authorities.

Upon hearing of Polaris' motion to quash, LSF first argued for dismissal because both accounts were titled in Polaris' name and no account was specifically set apart or held in trust as payroll taxes. The trial judge rejected LSF's argument, finding that "the garnishment statutes allow for challenges to garnishments" upon an allegation that the property in question does not belong to the judgment debtor.

Polaris' president, Mary Leonida, whose primary role was overseeing "operations and the accounting," was the only witness called at the hearing. She explained that Account No. 50 was used for

"payroll and payroll taxes at certain times" and Account No. 49 was used for "general operations and payroll taxes as well, sometimes." When Polaris' counsel asked her why Polaris would use funds from Account No. 49 for payroll taxes, she replied that

"[s]ometimes it was a matter of which one [account] had the most money for transferring so we would have to transfer a lesser amount from one to another. If the payroll account had more money [in] it, sometimes we would transfer from [the] general [Account No. 49] into payroll [Account No. 50] and sometimes it was visa versa."

The president also explained that an employee had set up an electronic funds transfer through the Electronic Federal Tax Payment System (EFTPS) on Friday, July 23, 2004, before the garnishment action was filed. EFTPS was directed to pull the designated funds out of defendant's Account No. 50 on Tuesday, July 27, 2004. At the time of her testimony, an EFTPS form was shown on an overhead screen, but that form is not admitted into evidence and does not appear in the record. Referring to some business notes taken by the employee who purportedly called in the transfer, Polaris' president testified that Polaris intended to instruct Commerce to transfer funds from Account No. 49 prior to July 27 because Account No. 50 did not contain sufficient funds to cover the EFTPS withdrawal. However, no one made any attempt to actually transfer funds between the accounts because of the garnishment action. EFTPS notified Polaris on July 29 that the scheduled July 27 withdrawal of funds for taxes transfer did not go through.

At the conclusion of the hearing, the trial court made several findings of fact and legal conclusions on the record. First, the trial court found that "the funds that were in this account, at least to the extent identified in the documents, were, or most of the funds in these accounts were actually payroll taxes withheld . . . to be paid into the Internal Revenue Service" and "that apparently is not disputed." The Court of Appeals agreed that there was no conflicting evidence offered on this point. However, as indicated in the discussion below, LSF very much disputed this finding. Second, the trial court concluded that these payroll taxes were "held in trust" for the taxing authorities. Finally, the trial court concluded that the failure to transfer funds from Account No. 49 (the general

operating account) to Account No. 50 (the payroll account) had no effect on its decision because "once the court determines that those funds are employees funds held in trust by Polaris, it doesn't really matter what account it comes from as long as it goes to the Federal Government."

The trial court noted that holding funds in Polaris' Restaurant accounts instead of a separate trust account made no difference because employers hold employee taxes " 'in Trust for the United States.' " According to the trial court, the money was "actually not necessarily Polaris's money but actually money held in trust by Polaris to pay their employees' income and social security taxes because it is their withholding." Because Polaris had arranged the electronic funds transfer before Commerce was served with an order of garnishment, the trial court held that the accounts were not subject to garnishment. The trial court therefore ruled that the money should be returned to Polaris for the purpose of paying its employees' taxes and that the remaining balance after taxes be paid to LSF to be put toward the judgment. The court then stayed its order so that LSF could appeal, on the condition that LSF post a $20,000 bond.

The Court of Appeals affirmed the trial court's decision in *LSF Franchise Reo I*, 35 Kan. App. 2d 189. Finding no Kansas case "where a debtor claimed the money being garnished from a bank account was being held in trust for someone else," the appellate court drew analogy to joint tenancy cases. 35 Kan. App. 2d at 192. Because the garnishment statutes allow joint tenants to rebut the presumption of equal ownership in joint bank accounts, the court reasoned, so too should a debtor be allowed to prove that money held in its accounts actually belongs to another entity. 35 Kan. App. 2d at 193. In addition, the court did not find the lack of notice to either Commerce or LSF to be determinative because "[i]f the money truly did not belong to Polaris, LSF was not entitled to garnish the funds." 35 Kan. App. 2d at 193.

The Court of Appeals concluded it "was not presented with any conflicting evidence" and the trial court's findings that the money in Polaris' account was held for tax purposes is "supported by substantial competent evidence." 35 Kan. App. 2d at 194.

## DISCUSSION

While not designated by the trial court as findings of fact and conclusions of law, the trial court ultimately concluded that the funds in both Account No. 49 and Account No. 50 were held in trust for taxing authorities, did not belong to Polaris, and were not subject to garnishment. We begin our discussion with the standard of review to be applied in reviewing these findings and conclusions.

### Standard of Review

The function of an appellate court is to determine whether the trial court's findings of fact are supported by substantial competent evidence and whether the findings are sufficient to support the trial court's conclusions of law. Substantial evidence is such legal and relevant evidence as a reasonable person might accept as sufficient to support a conclusion. *U.S.D. No. 233 v. Kansas Ass'n of American Educators*, 275 Kan. 313, 318, 64 P.3d 372 (2003). An appellate court's review of conclusions of law is unlimited. *Nicholas v. Nicholas*, 277 Kan. 171, 177, 83 P.3d 214 (2004). The appellate court does not weigh conflicting evidence, pass on credibility of witnesses, or redetermine questions of fact. *State ex rel. Morrison v. Oshman Sporting Goods Co. Kansas*, 275 Kan. 763, 775, 69 P.3d 1087 (2003).

The trial court and the Court of Appeals also interpreted and applied Kansas' garnishment statutes, which involve questions of law. The interpretation of a statute is a question of law over which this court has unlimited review. An appellate court is not bound by the trial court's interpretation. See *Foster v. Kansas Dept. of Revenue*, 281 Kan. 368, 374, 130 P.3d 560 (2006).

### Garnishment Statutory Law

Before discussing the merits of this appeal, it is helpful to set forth a general overview of garnishment law in Kansas. The current statutory scheme for garnishment, adopted by the Kansas Legislature in 2002, sets forth a detailed procedure by which a debtor's funds or other property may be attached. See K.S.A. 60-719 *et seq.* Under the Kansas garnishment statutes, earnings or wages of a debtor are treated differently than the funds that we consider in this case. See K.S.A. 60-733(c). We deal here with the garnishment

of funds held by a financial institution. See K.S.A. 60-731 and 60-733(g). In this situation, there are three key persons involved: A judgment creditor (garnishor), in this case LSF, which is owed money by the judgment debtor; the judgment debtor, in this case Polaris, which owes money to the judgment creditor; and the garnishee, in this case Commerce, which holds money of the judgment debtor.

### Order of Garnishment

After judgment has been entered against the judgment debtor in a civil case, K.S.A. 60-731 provides that the creditor may institute garnishment proceedings to attach property owned by the debtor but held by the garnishee. When the garnishment involves funds held by a financial institution, like Polaris' bank accounts with Commerce, the judgment creditor must have a good faith belief that the funds to be garnished belong to the judgment debtor. K.S.A. 60-733(g). In such cases, the order of garnishment must include the following statement: " 'If you hold any funds, credits or indebtedness *belonging to or owing the judgment debtor*, the amount to be withheld by you pursuant to this order of garnishment is not to exceed [the amount owed by the judgment debtor].' " (Emphasis added.) K.S.A. 60-733(c). After service of the order of garnishment, the judgment creditor must give the judgment debtor notice that the order has been served and must inform the debtor that the debtor has the right to demonstrate that the subject property is exempt from garnishment. K.S.A. 60-735.

### Answer of Garnishee

The garnishee bank's answer must contain a statement that " '[t]he amount of the funds, credits or indebtedness *belonging to or owing the judgment debtor* which I shall hold shall not exceed [the amount held by the bank subject to garnishment].' " (Emphasis added.) K.S.A. 60-733(d)(1). The garnishee must also state in its answer whether the judgment debtor owns the account(s) in question in joint tenancy with the persons not subject to garnishment. K.S.A. 60-733(d)(2). Once the garnishee answers the order of garnishment, any interested party may file a response. In addi-

tion, the parties may conduct limited discovery regarding the garnishee's statements.

*Hearing*

K.S.A. 60-735(b) provides that a judgment debtor may request a hearing to assert any claim that the accounts in question are exempt from garnishment within 10 days after it receives notice of the service of garnishment. If such a hearing is requested, the judgment debtor bears the burden of proof to show that any of the funds in question are exempt from garnishment. K.S.A. 60-735(c). In addition, if a party files a reply to the garnishee's answer, that party has the burden of proof to demonstrate the validity of its reply. K.S.A. 60-738. K.S.A. 60-733(f), not involved in this case, authorizes any joint tenant to prove that any of the funds in question do not belong to the judgment debtor.

*Judgment*

After hearing the parties' arguments, the court shall "enter an order determining the exemption [of the subject property] and such other order or orders as is appropriate." K.S.A. 60-735(c). If the court determines that the property in question is owned by the judgment debtor and held by the garnishee, it may enter judgment by (1) ordering payment into court, impoundment, foreclosure sale, etc., or (2) rendering judgment against the garnishee in the amount of the garnishee's indebtedness to the judgment debtor or for the value of the judgment debtor's property that the garnishee holds. K.S.A. 60-721(a)(3), (4). If a garnishee bank holds funds in two or more accounts owed to the judgment debtor, the bank may pay the garnishment judgment from any one or more of these accounts. K.S.A. 60-733(e).

*Kansas Case Law*

As the discussion above illustrates, garnishment proceedings affect only property owned by a judgment debtor. See K.S.A. 60-729. This ownership requirement that runs throughout the garnishment statutes codified early Kansas case law—which remains good law to this day—that "a judgment against the garnishee must be limited to *the actual, and not apparent, property of the defend-*

*ant in the possession or under the control of the garnishee* at the time the garnishee summons is served upon him." (Emphasis added.) *Septer v. Boyles*, 149 Kan. 240, Syl. ¶, 86 P.2d 505 (1939). This requirement of actual ownership necessarily means that a judgment creditor may not attach property that does not legally belong to the judgment debtor. As this court has explained,

"in garnishment proceedings the creditor takes the place and stands in the shoes of his debtor, taking only what the latter could enforce. [Citation omitted.] In *Investment Co. v. Jones*, 2 Kan. App. 638, the rule is stated as follows:

'Proceedings in garnishment do not change the legal relations and rights existing between the defendant and the garnishee, nor place the plaintiff in a more favorable position for the enforcement of a claim against the garnishee than would be the defendant in an action brought by him for the same cause; nor can any one be held in such proceedings to the payment of a liability which the defendant could not himself enforce because of existing equities and set-offs.' " *Harpster v. Reynolds*, 215 Kan. 327, 330, 524 P.2d 212 (1974).

See also *B. & M.R. Rld. Co. v. Thompson*, 31 Kan. 180, 196, 1 Pac. 622 (1884) ("Garnishee proceedings mean this: the creditor takes the place of the debtor. 'Only this and nothing more.' The former takes only that which the latter could enforce."). As one illustration of this rule, this court held in an early case that "if the money deposited [in a bank account] belongs to a third person, and is held by the depositor in a fiduciary capacity," that money may not be reached through garnishment. *Morrill v. Raymond*, 28 Kan. *415, Syl. ¶ 1. In *Morrill*, Orth, a judgment debtor, deposited money in a bank account in his own name, but that money was specifically advanced to him by Speer & Co., an agricultural firm, so he could act as its agent for the purchase of grain. This court found that the debtor "had the right to deposit [the money from Speer & Co.] in his own name, but not to use it, or any part of it, to satisfy his prior creditors." 28 Kan. at *418. Thus, the money in the account "belonged in equity to Speer & Co., and Orth held it in a fiduciary capacity." 28 Kan. at *418. "Orth had no right to apply this fund, in whole or in part, to pay or reduce the judgment . . . against him," and "the judgment creditor stood in no better position than the depositor." 28 Kan. at *419. Thus,

this court held that the money in the account was not subject to garnishment. 28 Kan. at *419.

Inherent in these decisions is the underlying conclusion that a judgment creditor may only reach property *actually owned* by the debtor—that the creditor has "no greater rights against the garnishee than the defendant" has, and thus the creditor is "not entitled to any more than the garnishee owe[s] to the defendant when process [is] served upon him. [Citations omitted.]" *Jewell v. Ellis*, 103 Kan. 604, 606-07, 175 Pac. 970 (1918).

As the earlier discussion of the Kansas garnishment statutes demonstrates, this ownership requirement has been incorporated into the present statutory scheme. K.S.A. 60-732(c) delineates the property that may be attached by an order of garnishment. Subsection (c)(1) explicitly states that a creditor may attach "[a]ll intangible property, funds, credits or other indebtedness *belonging to or owing the judgment debtor*, other than earnings, which is in the possession or under the control of the garnishee." (Emphasis added.) Implicit in the statute's language is a requirement that, in order for property to be garnished, it must first be actually owned by or owed to the judgment debtor.

Because ownership is a requirement for garnishment, it necessarily follows that parties to a garnishment proceeding should be allowed to offer evidence to demonstrate who actually owns disputed property. This corollary was recognized by this court's early decision in *Morrill*, where the court explained that, regardless of the fact that the account containing the money in question was titled in Orth's name (the judgment debtor), "it was the duty of the court to decide to whom in equity the deposit beneficially belonged." 28 Kan. at *418.

Instead of citing this precedent, the Court of Appeals panel below relied heavily on the law relating to joint tenancy in garnishment cases. While this analogy is not necessary given the underlying principle in garnishment proceedings that the property garnished must actually belong to the debtor, it is helpful in that it provides yet another example of courts holding that actual ownership is a prerequisite to garnishment.

Even prior to the current statutory scheme for garnishment, Kansas courts recognized that "in the garnishment of a joint bank account, only the interest actually owned by the garnishment debtor is subject to seizure." *Miller v. Clayco State Bank*, 10 Kan. App. 2d 659, 664, 708 P.2d 997, *rev. denied* 238 Kan. 878 (1985). When the legislature revised the garnishment code, this holding was integrated into K.S.A. 60-733, which governs the garnishment of funds held by financial institutions. The statute states in relevant part:

> "If an order of garnishment attaches funds, credits or indebtedness held by a bank, . . . and the garnishee holds funds or credits or is indebted to the judgment debtor in an account which judgment debtor owns in joint tenancy with one or more individuals who are not subject to the garnishment, the garnishee shall withhold the entire amount sought by the garnishment. Neither the garnishor nor the garnishee shall be liable to the joint owners if the ownership of the funds is *later proven not to be the judgment debtor's*." (Emphasis added.) K.S.A. 60-733(f).

## *LSF's Preliminary Argument*

With the above as background, we first consider LSF's argument that this court should adopt a rule that bank accounts can avoid garnishment only when they are designated as "special" or expressly "held in trust." According to LSF, such a designation would give notice to creditors that the accounts are not subject to garnishment. Moreover, LSF asserts that, if such a rule were adopted in Kansas, no additional evidence regarding ownership of the bank accounts would be admissible. Thus, under the asserted reasoning, the accounts here, which are held in the sole name of Polaris, would be subject to garnishment because such accounts were not designated as "special" or "held in trust" for some specified purpose.

LSF relies upon *Capital Serv., Inc. v. Dahlinger Pontiac-Cadillac, Inc.*, 10 Kan. App. 2d 328, 330, 699 P.2d 549, *rev. denied* 237 Kan. 886 (1985), to support its position. In addressing special circumstances that may prevent funds held by a bank from being garnished, *Capital Serv.* stated that one such "circumstance" arises where an account is designated as " 'special' " or is " 'held in trust' by the bank for [an] expressed purpose." 10 Kan. App. 2d at 330. The Court of Appeals there explained that an account was "special"

where an agreement existed between the bank and the depositor that the account would only be used for a particular use, such as payroll in *Capital Serv.*, and where the depositor could not use the funds in the account for any other purpose. 10 Kan. App. 2d at 329, 332. Because the debtor there "could not have paid [the judgment creditor] by drawing a check on the payroll account," the account was special and not subject to garnishment. 10 Kan. App. 2d at 332.

However, the Court of Appeals below correctly and expressly rejected the position advocated by LSF that a designation of "special" was required in order to prevent the funds from being garnished. *LSF Franchise Reo I*, 35 Kan. App. 2d at 192. We agree with the Court of Appeals for two reasons. First, garnishment depends upon whether the judgment debtor owns the property in question, and as the prior opinions of Kansas courts demonstrate, ownership is not necessarily determined by the name put on the account. See *Morrill*, 28 Kan. at *419; *Miller*, 10 Kan. App. 2d at 664. Second, Kansas law expressly provides for a hearing when there is a dispute about ownership of the property in question. In some instances, accounts of the judgment debtor may not be designated "special," yet the law acknowledges that if the property does not belong to the judgment debtor it may not be garnished.

Elaborating upon the latter point, K.S.A. 60-735 anticipates a hearing in garnishment actions where the judgment debtor may claim that the funds on deposit are exempt from garnishment together with the resolution of other claims made by the parties to the garnishment. By placing the burden of proof on the judgment debtor to demonstrate that it does not own the funds in question, K.S.A. 60-735(c) provides sufficient protection for judgment creditors' interests. The position advocated by LSF is contrary to the law of Kansas and is rejected as a matter of law.

*The Trial Court's Conclusion that Polaris' Accounts Are Exempt from Garnishment*

The trial court held that the monies in Polaris' Commerce accounts were not subject to garnishment. Specifically, after hearing evidence from Polaris and argument by both parties, the trial court

found that "the funds that were in this account, at least to the extent identified in the documents, were, or most of the funds in these accounts were actually payroll taxes withheld . . . to be paid into the Internal Revenue Service." In addition, the trial court found that these payroll moneys were "held in trust" for the taxing authorities and thus, did not belong to Polaris. According to the trial court, the failure of Polaris to request any transfer of funds from its general operating account to the payroll account was inconsequential because "once the court determines that those funds are employees funds held in trust by Polaris, it doesn't really matter what account it comes from as long as it goes to the Federal Government." Because Polaris had arranged for the electronic funds transfer before Commerce was served with the order of garnishment, the trial court held that the accounts were not subject to garnishment.

The trial court's findings and conclusions may be divided into three points which, when considered according to our standard of review, resolve the issues in this appeal: (1) The money in Polaris' two accounts actually consisted of payroll taxes; (2) because the money in Polaris' accounts was "held in trust" for the taxing authorities, no separate account was necessary to preserve the money from garnishment; and (3) the money did not belong to Polaris. It is important to note that Polaris bore the burden of proof to establish that it did not own the funds in its two Commerce accounts at the time of service of garnishment.

(1) *The money in Polaris' two accounts actually consisted of payroll taxes.*

The trial court stated that this conclusion—that the money in question was composed of employee payroll taxes—was "apparently . . . not disputed." Not only was this conclusion disputed at the hearing by LSF, but the only evidence of record fails to support the trial court's conclusion.

Leonida, the president of Polaris and supervisor over the accounts, explained the relationship between Polaris' Commerce accounts and its employees' payroll taxes as follows:

"Q. [By Polaris' counsel] Typically what did you use that account [referring to Account No. 50, the designated payroll account] for?

"A. [By Leonida] For payroll and payroll taxes *at certain times*.

"Q. Okay. Now the other account, account number 49 [operation account] was used for what?

"A. For operate, general operations *and payroll taxes as well, sometimes*.

"Q. *So, although, you had another account that was designated payroll account you still used the operating account, so to speak, for payroll taxes?*

"A. *At times, yes.*

"Q. Okay. What would cause you to use that account for payroll taxes?

"A. *Sometimes it was a matter of which one had the most money for transferring so we would have to transfer a lesser amount from one to another. If the payroll account had more money [in] it, sometimes we would transfer from general into payroll and sometimes it was visa versa."* (Emphasis added.)

This exchange provides the only evidence, apart from Leonida's testimony regarding the EFTPS transfer request, discussed below, and the fact that Account No. 50 had the description "payroll account" in its address line, that could possibly support the trial court's conclusion that "most of the funds in these accounts were actually payroll taxes." At best, Leonida's testimony shows that the company would *sometimes* use money from either account to cover its payment of payroll taxes. It does not support a conclusion that the monies in both accounts at the time of garnishment were exclusively composed of payroll taxes, or how much of the money, if any, was actually composed of taxes withheld for later payment to the government. Leonida did not testify that the money in either account was unavailable to Polaris or that there was any agreement with Commerce that funds in either account could be withdrawn only for purposes of paying payroll taxes. Rather, as indicated above, her testimony suggests that neither account held exclusively employee payroll taxes, and money was transferred between accounts depending upon the need.

According to Leonida, Account No. 50 (the payroll account) was used for "payroll *and* payroll taxes *at certain times*." (Emphasis added.) She did not state that all of the money in Account No. 50 at the time of garnishment consisted of payroll taxes, nor did she provide any documentation that would demonstrate the proportion of money in the account that was used for payroll taxes and the

proportion that was used for employee wages. Moreover, despite her testimony that she was primarily in charge of accounting at Polaris, Leonida did not provide an accounting that would demonstrate the amount of money in the account that was specifically intended to be used as payroll taxes. Instead, Leonida testified that amounts in both accounts were transferred back and forth by check or by a call to the bank, depending upon the balances and the need. The record contains no testimony or evidence that an arrangement was made by Polaris with Commerce that funds in either account could only be used for taxes or that Polaris had earmarked the funds in Account No. 50 at the time the garnishment was served to be used specifically for tax purposes.

The evidence supporting a conclusion that Account No. 49 (the general operating account) consisted of payroll taxes at the time of garnishment is even less compelling. Leonida stated that the money in that account was used for "general operations and payroll taxes *as well, sometimes*." (Emphasis added.) However, she provided no evidence that any of the money held in that account was from payroll taxes. According to her testimony, Polaris would, at the company's discretion, "sometimes" use either account to pay the taxing authorities. This does not support a finding that all (or most) money in both accounts only consisted of payroll taxes when the order of garnishment was served on Commerce. Rather, the record supports a contrary finding, as the money in both accounts was used by Polaris as Polaris determined.

The trial court's conclusion was likely influenced by the fact that Polaris owed almost $9,000 in taxes and had just over $9,000 total in its two accounts when the hearing was held. However, this fact alone does not show that the money in those accounts consisted of payroll taxes. The trial court apparently took no note of the fact that at the time the EFTPS request was made, Polaris' Account No. 50 showed a balance of $9,617.07, which would have more than covered the requested payroll tax transfer. While this account total was later revised because two deposits into the account were returned on July 27 and July 29, it demonstrates at a minimum that there was some question as to whether the remaining money in Polaris' accounts solely consisted of payroll tax monies or

whether the funds were intended to be used for a number of other purposes.

While it is true that a reviewing court should not reweigh the evidence or reassess the credibility of witnesses, the record here is utterly devoid of evidence supporting the trial court's finding that all (or most) of the funds in Polaris' Commerce accounts "were actually payroll taxes withheld . . . to be paid into the Internal Revenue Service." Polaris had the burden of proof to show that the balances for the two accounts, although titled in its name, could not be garnished because they actually consisted of employee taxes. Account No. 50 was described as a "payroll account," but Polaris' president testified that the account consisted of both payroll taxes and employee wages. Account No. 49 was a "general operating account" that was *sometimes* used to pay taxes as well. Polaris provided no testimony or documentation to demonstrate what proportion of the money was actually composed of earmarked payroll taxes. Under the above circumstances, we conclude that the evidence fails to support the trial court's conclusion that Polaris' accounts consisted almost entirely of payroll taxes. See *U.S.D. No. 233*, 275 Kan. at 318.

(2) *Because the money in Polaris' accounts was "held in trust" for the taxing authorities, no separate account was necessary to preserve the money from garnishment.*

The trial court found that because Polaris was required by law to withhold its employees' taxes for later payment to the taxing authorities, the money in its accounts was "held in trust" for the taxing authorities and thus not subject to garnishment. At the garnishment hearing below, the court stated that because federal law requires employers to "hold these funds '[i]n Trust for the United States,'" the money does not actually belong to the employers and cannot be garnished. The trial court further concluded that "the money is actually not necessarily Polaris' money but is actually money held in trust by Polaris to pay their employees' income and social security taxes because it is their withholding." For this reason, the court found that "those funds . . . are exempt from ap-

plication to pay the debt of the Polaris and the judgment on this case."

The Court of Appeals provided little analysis on this issue, finding only summarily that "[t]he trial court's findings are supported by substantial competent evidence" and that "[t]he trial court did not err in quashing the garnishment order." *LSF Franchise Reo I*, 35 Kan. App. 2d at 194.

To support its conclusion that the monies in both accounts were "held in trust" for taxing authorities, the trial court relied upon *United States v. Energy Resources Co.*, 495 U.S. 545, 109 L. Ed. 2d 580, 110 S. Ct. 2139 (1990), a bankruptcy case, for the proposition that Polaris was holding its employees' taxes "[i]n Trust for the United States." The portion of *Energy Resources* cited by the trial court explained:

"The Internal Revenue Code requires employers to withhold from their employees' paychecks money representing employees' personal income taxes and Social Security taxes. 26 U.S.C. §§ 3102(a), 3402(a). Because federal law requires employers to hold these funds in 'trust for the United States,' 26 U.S.C. § 7501(a), these taxes are commonly referred to as 'trust fund' taxes. [Citation omitted.]" *Energy Resources*, 495 U.S. at 546-47.

Applying this language to the instant facts, the trial court essentially concluded as a matter of law that, because Polaris owed money for taxes, Polaris' accounts were "held in trust" for the government and thus exempt from garnishment.

Section 7501(a) of the Internal Revenue Code, cited in *Energy Resources*, states:

"Whenever any person is required to collect or withhold any internal revenue tax from any other person and to pay over such tax to the United States, the amount of tax so collected or withheld shall be held to be *a special fund in trust for the United States*. The amount of such fund shall be assessed, collected, and paid in the same manner and subject to the same provisions and limitations (including penalties) as are applicable with respect to the taxes from which such fund arose." (Emphasis added.) 26 U.S.C. § 7501(a) (2000).

In resolving this issue, we deal with a factual question: What evidence in the record establishes that funds in the two Commerce accounts did not belong to Polaris? The above conclusion by the trial court resolves the question as a matter of law based upon its

reading of *Energy Resources*. However, the fact that federal law requires employers to hold employee taxes in trust for the United States does not establish ownership in the United States if such funds were not so held. In this case, the trial court's legal conclusion is without evidentiary support. We deal with accounts that were used by Polaris for purposes other than taxes. Polaris had no separate account designated as a withholding account to be drawn upon solely for withholding taxes. Monies were transferred back and forth between both accounts in question, and there simply is no evidence or accounting to establish which funds were withheld taxes, which funds were used for operating expenses, and which funds belonged to the employees for salaries.

The problem with the trial court's conclusion, and the Court of Appeals' summary agreement with that conclusion, is that there is no evidence in the record to support the finding. In fact, the trial court's conclusion—that Polaris' obligation under federal tax law establishes that the money in both of Polaris' accounts is exempt from garnishment—is undermined by the only evidence of record. Polaris comingled or mismanaged its funds, leading to an insufficient amount in its payroll account to cover its payroll taxes. The record failed to identify what monies in the accounts were Polaris' withholdings and suggested that the final determination of withholdings was made by Polaris at the time the tax was due.

We conclude that the trial court erred in its conclusion that the funds in Polaris' Commerce accounts were "held in trust" for tax purposes and thus automatically immune from garnishment. Clearly, the money in the accounts was used for additional purposes, as well as for taxes. Moreover, there was no evidence that Polaris had any arrangement with Commerce to limit withdrawals on these accounts to withdrawals made for taxing purposes. While it was not necessary under Kansas law for Polaris to keep its payroll taxes in a separate account to protect them from garnishment, Polaris was nevertheless required to provide *some additional evidence* to demonstrate that the monies in question—from both accounts— were being "held in trust" for taxing authorities. Polaris did not meet its burden in this regard.

### (3) *The money did not belong to Polaris.*

As we discussed above, the trial court found that because the funds were held in trust for the United States, they did not belong to Polaris. We have examined and rejected the trial court's conclusions that the funds in both accounts were held in trust for taxes. However, the trial court also concluded that Polaris' arrangement for the electronic transfer of funds via EFTPS before LSF's service of the order of garnishment on Commerce, as well as Polaris' president's testimony it intended to transfer funds between its accounts to cover the EFTPS transfer, rendered the funds in both accounts immune from garnishment under Kansas law. We now address whether the record supports the trial court's conclusions regarding Polaris' alleged intention to transfer of funds from Account No. 49 to Account No. 50 (the account transfer), as well as the request for an electronic transfer of funds through EFTPS (the EFTPS transfer request). The question underlying both of these determinations is whether Polaris met its burden to demonstrate that it did not own the monies in its accounts, and thus, that these funds were immune from garnishment.

Polaris' president, Leonida, testified at the garnishment hearing that on the morning of July 23, prior to the service of the order of garnishment, one of Polaris' employees arranged for an electronic funds transfer through EFTPS, which was directed to pull the designated amount out of Polaris' account on Tuesday, July 27. Leonida made reference during her testimony to some document describing the proposed funds transfer, which was apparently viewed on an overhead at the hearing. This document was not admitted into evidence and does not appear in the record. In fact, Leonida's testimony is the only evidence in the record that purports to show that an EFTPS transfer was requested or that a transfer was tried and denied.

As a preliminary matter, we note that because the transfer document was never admitted into evidence, there is some confusion in the record as to which account was subject to the EFTPS transfer. Leonida mentioned both accounts in her testimony, but she also testified that it was Polaris' intent to transfer funds from Ac-

count No. 49 to Account No. 50, so that sufficient funds would be available to pay the company's taxes on the designated date of transfer. Substantial competent evidence does not support a conclusion that the electronic transfer was to cover any account other than Account No. 50.

### The Account Transfer

According to Leonida's testimony at the garnishment hearing, Polaris had requested EFTPS to transfer roughly $8,700 in payroll taxes from Account No. 50 (the payroll account) on July 27. Leonida further testified that it was Polaris' intent to transfer funds from Account No. 49 (the general operating account) to Account No. 50 to cover the transfer, but this request was never made due to the service of the garnishment order on Commerce.

The trial court found the fact that Polaris never actually attempted to transfer the money from Account No. 49 to Account No. 50 to be inconsequential. The judge explained:

"I don't think it matters what account it's [meaning the funds in question] in. I think that those funds are . . . are exempt from application to pay the debt of the Polaris and the judgment on this case because those funds don't belong to Polaris they belong to the Polaris's employees. And Polaris was just holding that money for them pending distribution. . . . . It is just that they hadn't been transferred to [Account No. 50], really, it doesn't really matter, once the court determines that those funds are employees funds held in trust by Polaris, it doesn't really matter what account it comes from as long as it goes to the Federal Government."

We have concluded that there is no substantial competent evidence to support the trial court's conclusion that the funds in both accounts belonged to Polaris' employees as withheld taxes. We have also concluded that there is not substantial competent evidence to support the trial court's conclusion that the funds in both accounts were held in trust by Polaris for the taxing authorities. The remaining question to be answered regarding the intended transfer of funds between Polaris' accounts is whether, in the absence of other evidence of assignment, Leonida's testimony that Polaris intended to transfer the funds from Account No. 49 to Account No. 50 was sufficient to establish that Polaris no longer

owned the funds in Account No. 49 at the time of service of the order of garnishment. We determine that it was not.

While not cited by the trial court or the Court of Appeals, this court in the past has explained:

> " 'Where the principal defendant has made a valid assignment of the garnishee's indebtedness, or conveyance of the property in his possession belonging to such defendant, before the service of the summons upon the garnishee, the latter can not be charged on account of such debt or property.
>
> . . . .
>
> " 'In the absence of statutory provision prescribing the mode of assignment, no particular mode or form is necessary to effect a valid assignment of property, claims, or debts so as to defeat garnishment proceedings by a creditor of the assignor. If the intent of the parties to effect an assignment be clearly established, that is sufficient, and the assignment may be in the form of an agreement or order or any other instrument which the parties may see fit to use for that purpose. . . . [A]s between assignor and assignee, it is not necessary to the validity of an assignment that the garnishee be notified thereof; and the assignment will likewise be complete as against creditors of the assignor instituting garnishment proceedings after assignment and before notice of the assignment to the garnishee, provided that notice of the assignment be given to the garnishee in time to permit him to disclose the assignment in his answer to the garnishee process.' " *Hall v. Terra Cotta Co.*, 97 Kan. 103, 105-06, 154 Pac. 210 (1916) (quoting 20 Cyc. 1012-17).

At the hearing below, the evidence of Polaris' intent to transfer funds from Account No. 49 to Account No. 50 (in order to effectuate the EFTPS transfer) was limited to Leonida's testimony. When Leonida was asked by her own counsel whether the document describing the EFTPS transfer (which is not in the record) indicated "that you gave directions to the bank to transfer those funds to an account for payroll taxes," Leonida answered that the document only related to the EFTPS request and did not involve any transfer between the Commerce accounts. In addition, the following exchange took place between LSF's attorney and Leonida on cross-examination:

"Q. [By LSF's counsel] What was the . . . date that supposedly that this money was to be automatically withdrawn from these accounts?

"A. [Leonida] The, it was called in on the 23rd to be, which was a Friday, to come out on Tuesday the 27th.

"Q. That's of July?

"A. Yes. And that would give us time to transfer to make sure the funds were in the right account.

"Q. It was to be drawn out on July the 27th?

"A. Yes.                                                    .

"Q. And the bank was actually served with the garnishment on July 26th?

"A. No, on the afternoon of the 23rd was my understanding. .

"Q. Okay. So . . . I'm a little confused here a little bit on this. It was your instructions to the bank to take out of the operating account and put it into the payroll account?

"A. We were . . . *we hadn't done that yet but that was our intention to do that, yes.*

"Q. It was your intention to take it out of the operating account and put it in the payroll account.

"A. Yes.

"Q. And that didn't occur because of the garnishment that Commerce Bank received?

"A. That is correct.        ,

    . . . .

"Q. And so the funds were never ever moved from the operating account to the payroll account?

"A. That's correct, because the garnishment came through." (Emphasis added.)

This testimony illustrates that Polaris never made any attempt to transfer funds from Account No. 49 to Account No. 50. While Leonida contended that the garnishment was the reason that no attempt was made to transfer the funds, this does not change the fact that the *only* evidence of an intended account transfer was her testimony at the hearing. Though several hours passed between when Polaris' employee allegedly called in the EFTPS request and the service of the order of garnishment, no effort was made to transfer the funds during that time. Moreover, Polaris did not provide evidence of other times when such requests were made, to demonstrate when account transfer requests were generally made in relation to the EFTPS request.

As this court explained in *Hall,* "[i]f the intent of the parties to effect an assignment can be *clearly established,* that is sufficient" to insulate the assigned funds from garnishment. (Emphasis added.) 97 Kan. at 106 (quoting 20 Cyc. 1012-17). Apart from this statement, the Kansas courts have provided little insight as to whether Leonida's testimony alone was sufficient to establish Polaris' intent to transfer funds between its accounts or whether Po-

laris was required to present additional evidence of its intent to transfer in order to avoid garnishment of those funds. The Utah Court of Appeals recently considered this question—whether a party's testimony regarding intended use of otherwise garnishable funds is sufficient to avoid garnishment—in *J. Pochynok Co., Inc. v. Smedsrud,* 80 P.3d 563, 568 (Utah App. 2003), *reversed on other grounds,* 116 P.3d 353 (Utah 2005) (reversed and remanded for reconsideration of the trial court's assessment of attorney fees).

In that case, a judgment debtor, a contractor, challenged a trial court's determination that his bank account was subject to garnishment. In particular, the contractor argued that he had testified that certain monies in his account were intended to be paid to subcontractors, and thus, did not belong to him and should not have been subject to garnishment. The Utah Court of Appeals, like the trial court, rejected this argument, stating:

"Pochynok [the debtor] argues that the parties put on proof by proffer. However, even given the proffers made, we conclude the trial court did not err. Pochynok's argument that the funds in the account were not subject to garnishment because those monies were intended to be used to pay subcontractors on other projects is without merit. The funds, once in Pochynok's account, were owned by Pochynok. Thus, the decision to pay subcontractors with those funds, or to use the money elsewhere, was solely in the discretion of Pochynok." 80 P.3d at 568 n.6.

Not only did the court find that Pochynok's statements regarding the intended use of the money in his account to be without merit, it did not consider these statements to be valid for evidentiary purposes. As the court explained in its conclusion,

"[i]n Utah, there is a rebuttable presumption that the funds in a bank account belong to the account owner. [Citation omitted.] Hence, to avoid garnishment, a garnishee account owner must show by clear and convincing evidence that the funds belong to someone else. . . . However, the record . . . reveals that prior to and during the hearing, *Pochynok failed to present any evidence to the trial court in support of its claim of exemption.* With no competent evidence to counter the Smedsruds' position, the trial court did not clearly err in finding the funds were subject to garnishment." (Emphasis added.) 80 P.3d at 568.

The *Pochynok* case stands for the proposition that mere testimony of intent is not enough to establish the ownership of monies in a particular account. While that opinion is by no means binding

on this court, we find its reasoning persuasive. Were this court to decide that a party's testimony alone regarding intended use of funds was sufficient to establish ownership, it would open the floodgates to potential abuse by judgment debtors who sought to avoid garnishment. It is more equitable to require debtors seeking to demonstrate other ownership of disputed funds to provide some additional evidence, other than their own testimony, that would demonstrate that funds were, in effect, assigned to another and thus not subject to garnishment.

Apart from Leonida's testimony, there is nothing of substance in the record that would support a finding that Polaris intended to transfer money from Account No. 49 to cover its payroll taxes. In fact, there is evidence in the record to undermine this contention— the apparent balance in Account No. 50 was more than sufficient to cover the EFTPS transfer when it was requested on July 23; it was not until July 27 that the balance was reduced due to returned deposits. Thus, it appears from the documents in the record that Polaris would have known of no reason to transfer money between its Commerce accounts before July 27, when the EFTPS transfer was scheduled to take place.

An appellate court should not reassess the credibility of witnesses. *State ex rel. Morrison v. Oshman Sporting Goods Co. Kansas*, 275 Kan. 763, 775, 69 P.3d 1087 (2003). Our finding that Leonida's testimony was not sufficient to establish an intended assignment of funds is not a credibility assessment, however; it is instead a legal judgment that mere testimony of purported intent is insufficient to establish ownership of property in garnishment cases.

Polaris had the burden of " 'clearly' " proving that it intended to include the funds in Account No. 49 in its assignment of funds via the EFTPS request. See *Hall*, 97 Kan. at 106 (quoting 20 Cyc. 1012-17). The EFTPS request affected only Account No. 50. The only proof Polaris offered regarding its intent to transfer funds from Account No. 49 to Account No. 50 was the "after the fact" testimony of Leonida. This was not enough to meet its burden of proof. Thus, the trial court erred in holding that the money in Account No. 49 was not subject to garnishment.

## The EFTPS Transfer Request

The final question for our review is whether Polaris established at the garnishment hearing that the EFTPS transfer request, when submitted by Polaris on July 23, constituted an assignment of Polaris' ownership of the funds in Account No. 50, the payroll account.

According to Leonida's testimony, EFTPS is a service that "pulls payroll taxes out of existing checking accounts." Polaris' president testified that an employee had submitted the EFTPS request on the morning of July 23, arranging for employee taxes to be withdrawn from Account No. 50 on July 27. The order of garnishment was served on Commerce on the afternoon of July 23, with the effect of attaching all funds owned by Polaris in its Commerce accounts as of that time.

This court explained in *Hall* that " '[w]here the principal defendant has made a valid assignment of the garnishee's indebtedness, or conveyance of the property in his possession belonging to such defendant, *before the service of the summons upon the garnishee*, the latter can not be charged on account of such debt or property.' [Citation omitted.]" (Emphasis added.) *Hall*, 97 Kan. at 105-06 (quoting 20 Cyc. 1012-17). The determinative question, therefore, is whether the July 23 EFTPS transfer request constituted a valid assignment of Polaris' funds in Account No. 50, or whether the assignment of those funds would have taken place, but for the garnishment, on the date of the scheduled transfer (July 27). If Polaris failed to establish the former—that the assignment to EFTPS took place before Commerce was served with the order of garnishment—then Polaris owned the funds when the garnishment was served and the money in Account No. 50 is subject to garnishment.

The scarce record before us identifies EFTPS but contains no information on its nature. We note that neither the transfer request document nor the document indicating that EFTPS's attempted withdrawal of the funds was denied on July 27 was offered as evidence, and thus neither is part of the record on appeal, despite Leonida's discussion of both of these documents during her testi-

mony at the garnishment hearing. The only evidence pertaining to the assignment of funds by way of the EFTPS transfer request is found in Leonida's testimony. As the following discussion indicates, however, this testimony fails to demonstrate that Polaris' assignment of its funds in Account No. 50 was effective as of July 23, the date the EFTPS transfer was requested, rather than on July 27, when the transfer itself was scheduled to take place.

On cross-examination, counsel for LSF questioned Leonida concerning the nature of the EFTPS transfer request and the timing of Polaris' assignment of its tax funds:

"Q. [By LSF's counsel] And so there had not been any type . . . of entry made in connection with these two accounts in terms of actually transferring the monies to the Federal Government? The monies were still in your accounts at the time of garnishment?

"A. [By Leonida] That [is] correct. They were earmarked for the payroll taxes.

"Q. And there [were] no instructions to the Commerce Bank, as I understand it, to actually withdraw these monies from either one of these accounts and deposit it by direct deposit or something like that, to the United States Government.

"A. They would [have], the EFTPS automatically goes directly to the bank and pulls it out."

Contrary to Polaris' contention that it did not own the funds in Account No. 50 at the time the garnishment was served due to its previous EFTPS request, Leonida's testimony indicates that Polaris continued to exercise discretion over the money in its account after the request was made on July 23. If the garnishment had not been served, Leonida's testimony implies that Polaris would have continued to have control over these monies until July 27, when the EFTPS would have withdrawn on its account for tax purposes.

The fact that Polaris freely transferred money between its payroll and operating accounts further indicates that it continued to control the funds in both of its accounts, including Account No. 50, after the EFTPS request had been made. Leonida testified that EFTPS was authorized to withdraw money from Account No. 50 in this particular case, yet she also stated that Polaris intended to transfer funds sometime between July 23 and July 27 from Account No. 49 to Account No. 50 to cover the tax transfer. At cross-ex-

amination, LSF's counsel inquired as to when the transfer would have taken place:

"A. [By Leonida] The, it was called in on the 23rd to be, which was a Friday, to come out on Tuesday the 27th.

"Q. [By LSF's counsel] That's of July?

"A. Yes. And *that would give us time to transfer to make sure the funds were in the right account.*

"Q. It was to be drawn out on July the 27th?

"A. Yes.

. . . .

"Q. And so . . . the withdraw date being the 27th means that at that time EFTPS would withdraw on the 27th these funds?

"A. That's correct. That would give us time to transfer them." (Emphasis added.)

As this exchange demonstrates, the EFTPS could not withdraw the funds in question until July 27. Between July 23 and July 27, Polaris would have been free, in the absence of the garnishment, to transfer funds from its operating account into Account No. 50, in order that the transfer could later take place. The evidence therefore supports the contrary conclusion to that reached by the trial court—that Polaris retained control over all the funds in its accounts until the EFTPS transfer was actually scheduled to take place on July 27.

Polaris asks the court to assume, despite the vagueness of Leonida's testimony and the absence of other evidence in the record demonstrating that Polaris did not control the money in its accounts after the EFTPS transfer was requested on July 23, that the funds in Account 50 were no longer the property of Polaris *simply because it made a request* through EFTPS on July 23 to transfer funds to pay taxes on July 27 to the taxing authorities. Polaris bears the burden of proof to demonstrate that it did not own the money in its Account No. 50 after the morning of July 23—a burden it has not met. There simply is no evidence in the record to establish that the EFTPS transfer request, when made by Polaris on July 23, was a valid assignment of the money in its payroll account. Contrary to Polaris' assertions, a more reasonable conclusion from the sparse evidence of record would be that because Polaris' order

to disperse taxes would become effective on July 27, it was not until that date that the funds were no longer owned by Polaris.

This court does not reassess the credibility of witnesses; that assessment is within the province of the finder of fact. Here, the trial court heard the testimony from Polaris' president and concluded that because Polaris' president testified that the EFTPS transfer was requested before the garnishment was served, Polaris did not own the funds in both accounts. However, the trial court's conclusion does not reflect a proper understanding of Kansas' garnishment law, which requires clear evidence that an *assignment of ownership*, not merely a request for a transfer at a later date, was made prior to the service of the order of garnishment. See *Hall*, 97 Kan. at 105-06.

Polaris had the burden before the trial court to establish by substantial competent evidence that the funds in both accounts, and specifically Account No. 50, did not belong to Polaris. See K.S.A. 60-735(c). Polaris failed to meet this burden. Therefore, the trial court's conclusion that Polaris did not own the funds in its Commerce accounts (and thus that the accounts were not subject to garnishment) is not supported by substantial competent evidence.

*Conclusion*

In this case, Polaris sought to demonstrate through its motion to quash the garnishment of its Commerce accounts that the money in those accounts were exempt from garnishment. Pursuant to Kansas law, Polaris bore the burden of proof to demonstrate that it did not actually own the funds in its accounts, either because the funds actually consisted of employee taxes, or alternatively, because they had been previously assigned to the taxing authorities by way of the EFTPS transfer request. See K.S.A. 60-735(c); 60-738(b). As the above discussion indicates, Polaris failed to meet this burden.

Polaris could not demonstrate what proportion of the money in either account was actually held in trust for employee taxes. On the contrary, its president testified that the accounts were used for a number of purposes other than payroll taxes. Because there was no evidence in the record that would support the trial court's find-

ing that the accounts were composed entirely (or almost entirely) of payroll taxes, or that the money in Polaris' accounts was "held in trust" for taxing authorities, these findings were not supported by substantial competent evidence and are reversed.

As to the account transfer and EFTPS transfer request, the record similarly does not support the trial court's conclusion that Polaris did not own the funds in its Commerce accounts. The only evidence that the monies in Account No. 49 were to be included in the EFTPS transfer of payroll taxes from Account No. 50 (payroll account) was Leonida's testimony that Polaris intended to transfer money from Account No. 49 into its payroll account sometime before July 27. This testimony alone is insufficient to clearly establish an assignment of Polaris' ownership of the money in its operating account. Furthermore, with regard to the EFTPS transfer, Polaris did not meet its burden to establish that the EFTPS transfer, when requested on July 23, constituted a valid assignment of Polaris' ownership of the funds in the payroll account. Because Polaris did not meet its burden of proof to establish that it did not own the funds in these accounts, the funds in both Account No. 49 and Account No. 50 are subject to garnishment.

It would seem that the trial court below was influenced more by the fact that the taxes were owed by Polaris than by the facts and evidentiary record in this case. In some instances, this court will remand the case before it for a reconsideration of the evidence at the trial court level in light of its opinion. Remand is not necessary, however, where an appellate court announces no new legal principles, but instead reviews the record in light of the existing law and determines that the record cannot support the trial court's conclusions. Here, the record is examined and provides no factual support for the trial court's conclusion that the judgment debtor did not own the funds subject to garnishment. Thus, we hold that the accounts in question are subject to garnishment.

The decisions of the district court and the Court of Appeals are reversed and the case is remanded for further proceedings consistent with this opinion.

LUCKERT, J., not participating.

LOCKETT, J., Retired, assigned.