(191 P.3d 325)
No. 97,855

JANET J. JEANES, as Administrator C.T.A. of the ESTATE OF MAXINE J. ANTON, Deceased, *Appellant*, v. BANK OF AMERICA, N.A.; BANK OF AMERICA CORPORATION; RUDY WRENICK; and SHARON KUNARD, *Appellees*.

Opinion filed August 29, 2008.

*John R. Hamilton,* of Hamilton, Laughlin, Barker, Johnson & Watson, of Topeka, for appellant.

*Tom Haney* and *Thomas E. Beall,* of Henson, Clark, Hutton, Mudrick & Gragson, LLP, of Topeka, for appellee Sharon Kunard.

*Curtis E. Woods* and *Dolly R. Livingston,* of Sonnenschein Nath & Rosenthal LLP, of Kansas City, Missouri, for appellee Rudy Wrenick.

Before HILL, P.J., PIERRON and GREEN, JJ.

GREEN, J.: Janet J. Jeanes appeals from a summary judgment granted in favor Sharon Kunard and Rudy Wrenick in Jeanes' negligence, breach of fiduciary duty, and breach of contract claims. On appeal, Jeanes contends that the trial court improperly determined that the claims against Kunard sounded in tort. We disagree. In addition, Jeanes asserts that the trial court inappropriately granted summary judgment in favor of Kunard on her tort claims against Kunard. We disagree. Jeanes further maintains that the trial court erred in granting summary judgment to Wrenick on Jeanes' breach of fiduciary duty claim. We agree. Finally, Jeanes contends that the trial court erred in granting summary judgment to Wrenick on Jeanes' breach of contract claims. We disagree. Accordingly, we affirm in part, reverse in part, and remand to the trial court for further proceedings in accordance with this opinion.

On June 13, 1991, Maxine J. Anton created a living trust agreement entitled the "Maxine Jeanes Anton Living Trust." Under the living trust, Anton was to receive income from the trust assets for life. Upon Anton's death, the living trust set aside some of the assets to fund charitable remainder trusts for Anton's stepson and Anton's personal assistant. Nevertheless, the vast majority of the assets

were to pass to Janet J. Jeanes, Anton's niece and sole heir. Bank IV, the predecessor of Bank of America (the Bank), was named successor trustee of Anton's living trust. Anton also had two unitrusts, for which the Bank was trustee.

Anton entered into a written agency agreement with the Bank on July 5, 1991. Under the agency agreement, Anton deposited her common stock and securities with the Bank, including her common stock in Exxon Mobil Corporation. Anton served as trustee of her living trust, and the Bank served as agent for the trustee. According to the agency agreement, the Bank performed certain tasks for Anton, including the collection of dividends and interest for deposit in Anton's accounts; the collection of proceeds from the sale of assets as directed by Anton for deposit in Anton's accounts; and the paying of bills, debts, and other obligations such as charitable donations. In addition, the Bank collected financial and tax information and delivered it to Anton's accountant for preparation of Anton's tax returns. The agency agreement stated that the Bank would charge a fee for these services "in accordance with the schedule agreed upon by the Principal and Agent in writing." Anton's primary source of income was dividend and interest income, and most of that income came from her Exxon Mobil stock.

Anton first met with Sharon Kunard, a Topeka attorney, in 1991 to discuss setting up a trust for one of Anton's employees. At Anton's request, Kunard drafted trust documents and a will reflecting the wishes of Anton as expressed to Kunard. The last time Kunard was contacted by Anton for legal services was in June 2000. Anton's will, living trust, unitrusts, and all amendments thereto were prepared by Kunard.

In 1998, Rudy Wrenick was assigned to Anton's account and served as Anton's contact at the Bank. Wrenick holds the title of president of the Topeka branch of the Bank; he is a senior vice president and trust officer of the Bank.

Anton died on April 25, 2003. Anton's estate tax return indicated that Anton had a gross estate of $39,491,806. Anton's estate paid estate and inheritance taxes on January 24, 2004, which amounted to approximately half of the estate.

On November 24, 2004, Jeanes, in her capacity as administrator of Anton's estate, sued the Bank; Bank of America Corporation (BAC); Wrenick; and Kunard. The petition alleged claims of negligence and breaches of fiduciary duty, contract, and trust against the Bank, BAC, and Wrenick. In addition, Jeanes alleged negligence and breaches of fiduciary duty and contract claims against Kunard. These claims were based on the alleged failure of the appellees to protect Anton's assets from tax liability upon her death. Specifically, Jeanes alleged that setting up a family limited partnership would have saved over $6 million in taxes. Jeanes later amended the petition to include claims of improperly charged fiduciary fees.

The Bank, BAC, and Wrenick moved for summary judgment. Kunard moved separately for summary judgment. The trial court granted summary judgment on all claims in favor of BAC, Wrenick, and Kunard. The trial court noted that Jeanes had withdrawn her claims against BAC. The trial court later filed journal entries modifying its rulings, adding that its decisions granting summary judgment to Kunard and Wrenick constituted final judgments under K.S.A. 60-254(b). Jeanes timely appeals the grant of summary judgment to Wrenick and Kunard.

*Did the trial court err in ruling that the claims against Kunard sounded in tort?*

Jeanes argues that the trial court erred when it failed to consider Jeanes' separate breach of contract claim against Kunard and instead determined that Jeanes' claims against Kunard sounded only in tort. Jeanes claims that the evidence showed Anton had a contract with Kunard to give estate planning advice and Kunard breached that contract by failing to furnish any estate planning advice.

Turning to our standard of review, the standards for summary judgment are well known and can be stated as follows:

" ' "Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all

facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied." ' [Citations omitted.]" *Robbins v. City of Wichita,* 285 Kan. 455, 460, 172 P.3d 1187 (2007).

Additionally, the determination of whether a tort and contract claim can be brought in the same case is a question of law, which this court reviews de novo. See *Bittel v. Farm Credit Svcs. of Central Kansas, P.C.A.,* 265 Kan. 651, 660, 962 P.2d 491 (1998).

In analyzing this issue, the trial court relied on our Supreme Court's decision in *Canaan v. Bartee,* 276 Kan. 116, 133, 72 P.3d 911, *cert. denied* 540 U.S. 1090 (2003), where our Supreme Court stated:

" 'When there is both a contractual relationship and a relationship that gives rise to a legal duty, such as the attorney-client relationship, the breach of that duty and not of the contract itself gives rise to a tort action. . . . If the gravamen of the action is a breach of the legal duty and not of the contract itself, the action is in tort.' [Citation omitted.]"

In determining whether Jeanes' claims sounded in contract or in tort, the trial court considered the expert opinions procured by Jeanes. The trial court noted that the opinions included statements explaining the legal duties Kunard owed to Anton in connection with the estate planning services Kunard had provided. Jeanes' expert opined that Kunard was obligated to Anton to "use reasonable and ordinary care and diligence"; to use her "best judgment"; and to exercise that "reasonable degree of learning, skill, and experience which is ordinarily possessed by other attorneys in the community who practice estate planning." Moreover, regarding the agreement between Kunard and Anton, Jeanes' expert stated that if Kunard had intended to limit the scope of her estate planning services to Anton, Kunard "had the duty to explain" to Anton the consequences of the limitation and had "the duty to recommend" that Anton obtain other estate planning counsel.

Viewing this evidence in the light most favorable to Jeanes, the trial court determined that Jeanes' claims were based on allegations that Kunard had failed to exercise " 'that degree of learning, skill, and care that a reasonably competent lawyer would use in similar circumstances.' " Thus, the trial court determined that the claims against Kunard sounded in tort, and the court granted summary judgment in favor of Kunard on the contract claim.

Because an action for negligence against an attorney relies on a contract for employment, a legal malpractice claim generally contains elements of both tort and breach of contract. *Pancake House, Inc. v. Redmond*, 239 Kan. 83, 85-86, 716 P.2d 575 (1986). As a result, a legal malpractice claim can be brought as a breach of contract claim when "the act complained of is a breach of specific terms of the contract without any reference to the legal duties imposed by law upon the relationship created thereby." 239 Kan. at 86. Nevertheless, when "the essential claim of the action is a breach of duty imposed by law upon the relationship of attorney/client and not of the contract itself, the action is in tort. [Citation omitted.]" 239 Kan. at 86. A plaintiff may not frame a contract action as a tort action or a tort action as a contract action merely to avoid the legal limitation of one particular cause of action. *Malone v. University of Kansas Medical Center*, 220 Kan. 371, 376, 552 P.2d 885 (1976).

Jeanes argues that her breach of contract claim is different from her malpractice claim, that the trial court erred in blending the two claims, and that she should be allowed to bring both claims against Kunard. Jeanes cites *Pizel v. Zuspann*, 247 Kan. 54, 72-73, 795 P.2d 42, *modified* 247 Kan. 699, 803 P.2d 205 (1990), for the proposition that a tort and breach of contract claim can both be brought in the same case. In *Pizel*, however, the court noted that the case had been submitted to the jury on both contract and tort theories. The *Pizel* court pointed out that the jury had found no breach of contract. The court further noted that the jury had based its verdict on negligence. The *Pizel* court analyzed whether the negligence cause of action had accrued in order to determine if it was barred by the applicable statute of limitations. Our Supreme Court, however, did not analyze whether it had been proper to

raise a contract claim under the facts of that case. See 247 Kan. at 73-78.

"The nature of a claim—whether it sounds in tort or contract—is determined from the pleadings [citation omitted] and from the real nature and substance of the facts therein alleged. [Citation omitted.]" *Malone*, 220 Kan. at 374. Our Supreme Court analyzed whether both tort and breach of contract claims were warranted in *KPERS v. Reimer & Koger Assocs., Inc.*, 262 Kan. 110, 936 P.2d 714 (1997). In *KPERS*, the court carefully read the allegations set forth in the petition. Specifically, the breach of contract claim, which was based on an attorney-client employment contract, stated that the law firm had breached its contract *by failing to properly advise* the client. The court determined that the claims made under the breach of contract count sounded in tort and did not set forth contractual claims. 262 Kan. at 113-15.

In contrast, an attorney's conduct was determined to constitute a breach of contract in *Juhnke v. Hess*, 211 Kan. 438, 506 P.2d 1142 (1973). In *Juhnke*, the client sued his attorney for failing to file a timely notice of appeal. In the petition, the client alleged that he had employed the attorney to file an appeal from a decision, but alleged that the attorney had failed to do so within the prescribed period. The court stated that the client had pleaded breach of a specific contract: that the attorney had failed to do that which the attorney had expressly agreed to do. 211 Kan. at 441; see also *Tamarac Dev. Co. v. Delamater, Freund & Assocs.*, 234 Kan. 618, 622-23, 675 P.2d 361 (1984) (Because the cause of action was based on an oral contract calling for a specific result, the 3-year statute of limitations applied instead of the 2-year statute of limitations based on negligence.).

In the professional negligence portion of her petition, Jeanes alleged that Kunard had agreed to advise Anton concerning estate tax planning and other tax matters, including working with the Bank on estate planning, estate management, and tax matters. The petition then stated that Kunard was negligent or reckless in failing to perform certain acts that would have reduced the ultimate tax liability of Anton's estate after her death. In the breach of contract portion of the petition, Jeanes stated that Kunard and Anton had

entered into an attorney-client and a contractual relationship. Jeanes alleged that Kunard had failed to recommend and to implement estate tax planning measures that would have allowed the estate to avoid a substantial estate tax liability.

Yet, unlike the *Juhnke* decision, Jeanes' petition contained no allegation that Kunard had failed to do what she had expressly agreed to do, such as filing a notice of appeal, which was the issue in *Juhnke.* On appeal, Jeanes maintains that Kunard breached her contract with Anton by not giving her any estate-planning advice. Jeanes' assertion about Kunard's failure to give Anton any estate-planning advice is nebulous. To illustrate, Jeanes does not point to any evidence or language in her petition that states that Kunard had failed to do something which she had specifically agreed or contracted to do.

Moreover, under her negligence count, the petition stated that Kunard "worked with and consulted the Bank defendants with respect to estate planning and estate management on behalf of Ms. Anton, including with respect to tax matters." Similarly, under the breach of contract claim, the petition stated that Kunard had failed to implement estate planning measures. Particularly, there was no allegation that Kunard had agreed to implement a particular tax-saving method and had failed to do so. The breach of contract claim hinges on the same allegations made in the negligence claim: that Kunard had failed to satisfy her legal duty to exercise ordinary skill and knowledge in giving legal advice. See *Canaan*, 276 Kan. at 120. Jeanes' petition was not based on a breach of an alleged agreement of the parties. Instead, it was based on a breach of an alleged legal duty.

Consequently, the trial court correctly determined that the evidence did not support a breach of contract claim and that the gravamen of Jeanes' claims against Kunard sounded in tort. The trial court properly granted summary judgment on the breach of contract claim in favor of Kunard.

*Did the trial court err in granting summary judgment on the tort claims against Kunard because they had accrued after Anton's death?*

Jeanes argues that the trial court erred in failing to find the Kansas survival statute, K.S.A. 60-1801, applied to allow her to

bring tort claims on behalf of Anton's estate for legal malpractice against Kunard. Because the trial court granted summary judgment in favor of Kunard on Jeanes' tort claims, the summary judgment standard of review applies. See *Robbins,* 285 Kan. at 459-60. Moreover, to the extent the resolution of this issue requires interpretation of a statute or other questions of law, this court reviews those issues de novo. See *LSF Franchise REO I v. Emporia Restaurants, Inc.,* 283 Kan. 13, 19, 152 P.3d 34 (2007).

Legal malpractice requires a plaintiff to prove the following: (1) a duty of the attorney to exercise ordinary skill and knowledge; (2) a breach of that duty; (3) a causal connection between the breach of duty and the resulting injury; and (4) an actual loss or damage. *Canaan,* 276 Kan. at 120.

Jeanes argues that her tort claims were properly brought by the estate because the alleged legal malpractice actually caused harm to the estate. She also argues that the estate's claims survive under K.S.A. 60-1801 because they would have survived at common law.

Whether a particular cause of action survives the death of a party is to be determined by K.S.A. 60-1801. *Nicholas v. Nicholas,* 277 Kan. 171, 189, 83 P.3d 214 (2004) (citing *Gross v. VanLerberg,* 231 Kan. 401, 405, 646 P.2d 471 [1982]). K.S.A. 60-1801 states:

"In addition to the causes of action which survive at common law, causes of action for mesne profits, or for an injury to the person, or to real or personal estate, or for any deceit or fraud, or for death by wrongful act or omission, shall also survive; and the action may be brought notwithstanding the death of the person entitled or liable to the same."

The trial court pointed out that K.S.A. 60-1801 provides for survival of "causes of action for . . . an injury to the . . . personal estate." Finding that the statute did not specifically address the issue of when a claim must have accrued in order to survive, the trial court relied on common law in deciding when a personal representative may recover damages for injury to the personal estate.

Relying on *Mason v. Gerin Corp.,* 231 Kan. 718, 721, 647 P.2d 1340 (1982), the trial court determined that even if the legal malpractice claim was viewed as an injury to the personal estate of the decedent, the decedent's personal representative could only recover damages that accrued between the date of injury and the

death of the decedent. Because the damages alleged by Jeanes were the payment of excess estate taxes, the trial court determined that these damages accrued after Anton's death. Thus, the trial court found that the tort claims did not survive as a matter of law and that Kunard was entitled to summary judgment on those claims.

Now we turn our attention once again to Jeanes' argument. Jeanes argues that the rule from *Mason*, which the trial court relied on in determining that postdeath damages could not be recovered, is distinguishable. In *Mason*, 231 Kan. at 721, our Supreme Court stated: "A survival action allows the personal representative to recover damages accrued by the injured party between the date of injury and death for the benefit of the decedent's estate." Jeanes asserts that this statement is dicta because the *Mason* court was concerned with whether the statute of limitations had run on a wife's wrongful death claim under K.S.A. 60-1901 *et seq.*

Jeanes further points out that the *Mason* court relied on *Flowers, Administratrix v. Marshall, Administrator*, 208 Kan. 900, 494 P.2d 1184 (1972), for the rule when a particular cause of action survives the death of a party. In *Flowers*, the plaintiff sought to bring a claim for loss of earnings or earning capacity under the survival statute (K.S.A. 60-1801) in order to bypass the recovery cap on a wrongful death claim. Our Supreme Court held that "in an action under the survival statute *to recover damages for personal injury to plaintiff's decedent who died as a result of such injury,* recovery may not be had for loss of earnings or earning capacity beyond the time of death." (Emphasis added.) 208 Kan. at 908. Jeanes, however, argues that because K.S.A. 60-1801 does not specifically limit recovery of damages to property while a person is alive, recovery of postdeath damages should be recoverable under Restatement (Second) of Torts § 917 (1964).

Nevertheless, our Supreme Court adopted and favorably cited the *Flowers* decision in *Farm & City Ins. Co. v. American Standard Ins. Co.*, 220 Kan. 325, 337, 552 P.2d 1363 (1976) (The legislature in enacting the Kansas Automobile Injury Reparations Act dealt with two separate and distinct types of actions: the first, K.S.A. 60-1801, a survival action authorizing recovery of damages accruing

between the injury and the death of the injured person; the second, K.S.A. 60-1901, a wrongful death action for the exclusive benefit of all the heirs who have sustained loss from damages accruing after death.).

In addition, the trial court relied on *Price, Administrator v. Holmes,* 198 Kan. 100, 422 P.2d 976 (1967), in making its decision. In *Price,* the court held that to determine whether a particular cause of action survived, one must first determine when the cause of action accrued. The *Price* court stated that a cause of action in tort arising out of the faulty execution of a will did not accrue until damages had occurred. 198 Kan. at 104-06. Moreover, the court stated that if the decedent died before damages had occurred, a cause of action in tort did not survive him or her. 198 Kan. 105-06. Indeed, "[a] cause of action in tort does not survive in favor of the personal representative of a deceased person unless the same has accrued to the decedent during his [or her] lifetime." 198 Kan. 100, Syl. ¶ 4.

In *Price,* an action was filed to recover damages suffered by plaintiff's decedent because of a faulty execution of a will. The *Price* court, in applying K.S.A. 60-1801, held that the faulty execution of the will amounted to a breach of warranty. Moreover, the court held that the breach of warranty survived the death of the defendant decedent under K.S.A. 60-1801 and allowed the administrator of the plaintiff decedent to maintain the action against the defendant decedent. 198 Kan. at 106-07. In short, *Price* states that a tort action accrues when the injury occurs, but a contract action accrues when the breach occurs. 198 Kan. at 104-06.

On the other hand, Jeanes' challenges the trial court's determination that these tort claims cannot be brought by the estate because they did not accrue during Anton's lifetime. Jeanes argues that the estate's claims should be allowed because the harm in this case was suffered before Anton's death and the excessive taxes were simply an escalation of damages. Basically, Jeanes argues that Anton could have sued Kunard for negligent estate planning while she was alive, possibly receiving as damages a refund of her attorney fees paid to Kunard and attorney fees incurred in restructuring her estate plan. Moreover, Jeanes contends that because such a

cause of action existed while Anton was alive, Anton's estate's cause of action for recovery of excessive estate taxes survived Anton's death.

Jeanes' argument comes directly from the Texas Supreme Court's decision in *Belt v. Oppenheimer, Blend, Harrison & Tate,* 192 S.W.3d 780 (Tex. 2006). In *Belt,* two sisters were executors of their father's estate. The two sisters, in their capacity as executors, sued the attorneys who had prepared their father's will. They alleged that the attorneys were negligent in drafting the will and in advising their father on asset management. Specifically, the executors maintained that the estate had incurred over $1,500,000 in tax liability that could have been avoided by competent estate planning.

The trial court granted the attorneys' motion for summary judgment on the grounds that the estate planners owed no duty to the personal representatives of the deceased client's estate. The court of appeals affirmed, relying on a previous precedent. In the previous case, the court of appeals had held that an estate-planning malpractice claim did not accrue during the decedent's lifetime and, therefore, did not survive the decedent because the estate's injuries did not arise until after the decedent's death. Nevertheless, the Texas Supreme Court reversed. 192 S.W.3d at 789. The court held that the estate's personal representatives could maintain a legal malpractice action against the decedent's attorneys. 192 S.W.3d at 789.

In reaching its decision, the *Belt* court did not focus on the fact that the damages had occurred after the decedent's death. Instead, the court relied on the fact that the attorneys' alleged negligence occurred before the decedent's death: If the decedent had discovered the injury before death, the decedent could have sued the estate planners, possibly recovering the fees paid to them or the fees incurred in restructuring the estate to minimize tax liability. 192 S.W.3d at 786. The *Belt* court determined that "if the injury occurs during the client's lifetime, a claim for estate-planning malpractice survives the client's death. [Citation omitted.]" 192 S.W.3d at 786. It would seem that the *Belt* court believed that if there was an "actionable wrong" suffered by the decedent during his lifetime,

his estate should be allowed to bring a claim after his death. 192 S.W.3d at 786.

Nevertheless, *Belt* is distinguishable from this case based upon Kansas law. For example, Kansas courts allow a beneficiary of a will to sue an attorney who has negligently drafted a will in certain situations. See *Pizel*, 247 Kan. at 67-68; *Johnson v. Wiegers*, 30 Kan. App. 2d 672, 674-78, 46 P.3d 563, *rev. denied* 274 Kan. 1112 (2002). In contrast, whether a beneficiary could sue in the alternative was important to the *Belt* court when it decided that a representative of an estate *could* bring a negligence claim against an attorney alleging the payment of excessive estate taxes. 192 S.W.3d at 783-89.

In particular, one of the reasons for allowing the executors to pursue a recovery in *Belt* was that in Texas, a beneficiary could not sue the decedent's attorney. The *Belt* court noted that "precluding both beneficiaries and personal representatives from bringing suit for estate-planning malpractice would essentially immunize estate-planning attorneys from liability for breaching their duty to their client." 192 S.W.3d at 789. This is not the case in Kansas. Because beneficiaries can sue attorneys, Kansas attorneys may still be held liable to potential beneficiaries for malpractice. *Pizel*, 247 Kan. at 67-68.

Jeanes, however, attempts to distinguish her case from *Pizel* by maintaining that the estate's representative can bring the claims because the estate had been harmed. In adopting California's test for determining whether a beneficiary could recover against an attorney who has negligently drafted a will or trust document, the *Pizel* court quoted from a California Supreme Court case:

" 'In some ways, the beneficiary's interests loom greater than those of the client. After the latter's death, a failure in his testamentary scheme works no practical effect except to deprive his intended beneficiaries of the intended bequests. Indeed, the executor of an estate has no standing to bring an action for the amount of the bequest against an attorney who negligently prepared the estate plan, since *in the normal case the estate is not injured* by such negligence except to the extent of the fees paid; only the beneficiaries suffer the real loss.' [Citation omitted.]" (Emphasis added.) 247 Kan. at 66.

Jeanes argues that her claims do *not* involve the normal case where the estate is not injured. Instead, she contends that this is a case

where the estate itself *was* harmed by the attorney's alleged negligence.

Even if we accept Jeanes' assertions that her tort claims for legal malpractice are either a cause of action that involves injury to Anton's personal estate under K.S.A. 60-1801 or a cause of action that would have survived at common law, the tort claims must have accrued during Anton's lifetime to survive. *Mason,* 231 Kan. at 721. Jeanes cites *Sizemore v. Swift,* 79 Or. App. 352, 719 P.2d 500 (1986), in support of her argument that the legal malpractice claim survived Anton's death. This case relied on by Jeanes, however, is clearly distinguishable.

In *Sizemore,* a father had been receiving payments from a spendthrift trust for which the father was the beneficiary. When the father died, it was determined that the spendthrift trust included no provision for its distribution on the father's death. The father's son and sole heir had an attorney file a declaratory judgment action, which ultimately declared that the remainder of the trust corpus should be paid to the father's estate. Thereafter, the attorney opened the father's estate and was appointed administrator. The attorney received the trust corpus, paid his legal fees and the estate's administrative costs, and distributed the remainder to the son. The son then sued the attorney who had drafted the spendthrift trust for malpractice for not including a provision for distribution of the trust after the beneficiary's death. The administrator of the father's estate was substituted as the plaintiff, bringing a claim under the survival statute. In setting out the damages caused by the attorney's negligence, the estate claimed the following damages: the legal fees and costs charged by the attorney who litigated the declaratory judgment action and ultimately received the trust corpus on behalf of the father's estate.

The first issue the *Sizemore* court had to resolve was whether the administrator of the estate was the real party in interest. The *Sizemore* court determined that the estate had paid the attorney fees and costs of litigation in order to receive the trust corpus, so "[i]f anyone was damaged by an error of [the attorneys who drafted the spendthrift trust], it was the estate; it is, therefore, the real party in interest." 79 Or. App. at 356. After making some other

determinations not relevant here, the court then determined whether the expenses of litigation were damages that would support a negligence action. The court found that if the will containing the father's spendthrift trust was determined to be negligently drafted and if that negligence led to litigation expenses, the father's estate would not have otherwise incurred those expenses and if the other requirements for liability were satisfied, then the estate was damaged by the amount of the litigation expenses. 79 Or. App. at 358.

The only similarity between this case and *Sizemore* is that both cases deal with an estate suing an attorney for malpractice. *Sizemore,* however, is distinguishable from this case. For example, in *Sizemore,* the estate was incomplete when the decedent died because the trust corpus was not included; the estate had to incur fees in order to obtain the trust corpus, which made the estate whole. The attorney fees were paid by the estate in making the estate whole and in overcoming the alleged errors of the attorneys who drafted the trust for which the decedent was the beneficiary. In Anton's case, there is no allegation that the estate was incomplete at her death and that funds were incurred by the estate in realizing the estate.

Turning once again to Jeanes' argument that her tort claims survive under K.S.A. 60-1801, we will consider some of Jeanes' other authorities cited in her brief.

Jeanes cites *Jones v. Siesennop,* 55 Ill. App. 3d 1037, 371 N.E.2d 892 (1977), in support of her argument that the legal malpractice claim survived Anton's death as injury to her personal estate. Nevertheless, in *Jones,* the decedent's malpractice claim had clearly accrued during her life. The decedent and her husband had been represented by an attorney at a real estate closing. Before her death, the decedent had filed a lawsuit against the attorney for negligence in his handling of the transaction by failing to provide the decedent with clear title to the property because he did not secure and record a release of a previous mortgage on the property. Because the plaintiff decedent had already been damaged by the attorney's conduct before she died, her claim had accrued during her lifetime. 55 Ill. App. 3d at 1041-42. Moreover, the Illinois

Court of Appeals recognized that a legal malpractice claim must have accrued in the decedent's lifetime to survive the decedent's death. 55 Ill. App. 3d at 1039-41. Thus, *Jones* actually supports the trial court's decision.

Jeanes also cited *Nathan v. Touro Infirmary*, 512 So. 2d 352 (La. 1987), in support of her argument that her tort claims survived as injury to Anton's personal estate. Yet, in *Nathan*, the plaintiff's claim for medical malpractice stemmed from treatment he had received for a broken hip, and the plaintiff actually filed a lawsuit alleging malpractice before he died. The plaintiff in that case had sustained damages before he died, and there was no question that his claim had accrued during his lifetime.

Jeanes also cites *Katz v. Filandro*, 153 Ariz. 601, 739 P.2d 822 (1978), on this issue. The decedent's wrongful death claim accrued during her lifetime because her claim was based on her daughter, who was killed while the plaintiff decedent was still living. After the court in *Katz* held that the plaintiff decedent's claim for loss of economic support survived her death, it went on to hold that her damages for that claim were limited to those which had accrued at the time of her death. 153 Ariz. at 606-07. Thus, *Katz* supports the trial court's finding that "even if the Plaintiff's legal malpractice claim survived, recovery would be limited to the damages which accrued between the date of injury and the death of Maxine J. Anton."

Jeanes also cites *Cleveland v. United States*, 2000 WL 1889640 (N.D. Ill. 2000) (unpublished opinion). There, the decedent's wife alleged that her deceased husband's attorney had given him bad advice in dealing with the Internal Revenue Service (IRS). Moreover, as a result of that advice, her husband was told by the IRS that he was going to be audited. He committed suicide before the audit. Clearly, the decedent was harmed by his attorney's negligence before he killed himself. Consequently, his claim accrued during his lifetime. See 2000 WL 1889640, at *3. *Cleveland* is inapplicable to the issue of whether Anton's claim accrued during her lifetime.

Jeanes relies heavily in her brief on *Hosfelt v. Miller*, 2000 WL 1741909 (Ohio App. 2000) (unpublished opinion). Moreover, the

*Hosfelt* court noted: "The outcomes of various Ohio cases seem to presume, without directly addressing the issue, that a personal representative of the estate has standing to assert legal malpractice claims *which arose during the decedent's lifetime.* [Citation omitted.]" 2000 WL 1741909, at *5. Thus, the *Hosfelt* court also recognized that the malpractice claim must have arisen during the decedent's lifetime, although the court may have incorrectly held that the decedent's legal malpractice claim had accrued during her lifetime. See 2000 WL 1741909, at *5-6.

The proposition that a malpractice claim must have arisen during a decedent's lifetime was considered in *Rutter v. Jones, Blechman, Woltz & Kelly,* 264 Va. 310, 568 S.E.2d 693 (2002). There, the plaintiff raised the same argument Jeanes raises here: that there was a cause of action during the decedent's lifetime because the decedent could have sued to recover the amounts she had paid to the attorneys who had drafted the deficient testamentary documents. Moreover, the plaintiff argued that the tax liability and associated accounting and legal expenses incurred after the decedent's death were merely an escalation of the damages caused by the attorneys' malpractice. In rejecting this argument, the court stated:

"As noted above, one of the elements of a legal malpractice cause of action is injury or damage proximately caused by the breach of contract. In this case, the fee Duncan paid the defendants for their services was not an injury resulting from the legal malpractice. It was merely the agreed-upon cost of the service, the consideration given for the contract, and not the damage or injury arising from the breach of the contract.

"The injury or damage that was proximately caused by the legal malpractice alleged in this case was the additional amount of the tax assessed against the estate and additional legal and accounting fees required—all of which did not arise until after Duncan's death.

"Accordingly, because the cause of action for legal malpractice asserted in this case did not come into existence during Duncan's lifetime and thus did not survive her death, we will affirm the judgment of the trial court." 264 Va. at 314.

The injury that was proximately caused by the legal malpractice was the additional amount of taxes assessed against the estate. Because the cause of action for legal malpractice did not come into existence during the decedent's lifetime and did not survive her

death, judgment in favor of the attorney was upheld. 264 Va. at 314. The language in *Rutter* is very persuasive.

For example, the fees Anton paid Kunard for her legal services were not any injury resulting from any alleged malpractice. They were merely the agreed-upon cost of Kunard's services and were not the substantial injury arising from the alleged legal malpractice claim.

To illustrate, Kansas courts generally observe the rule that a cause of action accrues as soon as the right to maintain a legal action arises. The test to determine when an action accrues is that point when a plaintiff could have first filed and prosecuted an action to a successful conclusion. *Pancake House, Inc. v. Redmond,* 239 Kan. 83, 87, 716 P.2d 575 (1986). The *Pancake* court recognized that depending upon the facts and circumstances of each case, at least four theories can apply in Kansas when determining the accrual of a cause of action for legal malpractice:

"(1) The occurrence rule—the statute begins to run at the occurrence of the lawyer's negligent act or omission.

"(2) The damage rule—the client does not accrue a cause of action for malpractice until he suffers appreciable harm or actual damage as a consequence of his lawyer's conduct.

"(3) The discovery rule—the statute does not begin to run until the client discovers, or reasonably should have discovered, the material facts essential to his cause of action against the attorney.

"(4) The continuous representation rule—the client's cause of action does not accrue until the attorney-client relationship is terminated." 239 Kan. at 87.

For cases discussing all four points, see Annot., 32 A.L.R.4th 260; ABA/BNA Lawyers' Manual on Professional Conduct § 301:901 (1985); Mallen and Levit, Legal Malpractice § 388 *et seq.* (2d ed. 1981).

Under the damage rule, "[a] tort action shall not be deemed to have accrued until the act giving rise to the cause of action first causes substantial injury." *Chavez, Executrix v. Saums,* 1 Kan. App. 2d 564, 565, 571 P.2d 62, *rev. denied* 225 Kan. 843 (1977); see *Knight v. Myers,* 12 Kan. App. 2d 469, 473, 748 P.2d 896 (1988) (K.S.A. 60-513(b) specifically states that a tort action accrues either

when (1) the act giving rise to the cause of action first causes substantial injury, or (2) if the fact of the injury is not reasonably ascertainable, the time at which the injury does become reasonably ascertainable to the injured party.).

In the present case, Anton suffered no ascertainable injury to justify an action for recovery of damages until after her death. In her brief, Jeanes states as follows: "Had Kunard provided competent estate planning as she was retained for, [Anton's] estate would not have had to pay $6,793,804.06 in additional taxes." No injury occurred until the estate's tax liability was determined, which would have been after Anton's death. It was at that point in time that the estate suffered substantial injury.

In summary, substantial injury resulting from Kunard's alleged malpractice would have been the estate taxes imposed against Anton's estate, which did not arise until after Anton's death. Therefore, the cause of action for legal malpractice did not accrue in Anton's lifetime and did not survive her death. To illustrate this point further, Kunard points out that the trial court correctly stated that Jeanes' pretrial order made no allegation that Kunard had caused Anton damages during Anton's lifetime. Moreover, in the pretrial order, Jeanes framed the damages to Anton's estate as the amount of taxes imposed after Anton's death.

The trial court properly found that Jeanes' tort claims for legal malpractice did not survive Anton's death. Based on *Mason, Flowers,* and *Price,* we determine that the trial court properly granted summary judgment to Kunard.

*Did the Trial Court Err in Granting Summary Judgment to Wrenick on Jeanes' Breach of Fiduciary Duty Claim Because That Claim Did Not Survive Anton's Death?*

Jeanes argues that the trial court erred in granting summary judgment to Wrenick on Jeanes' breach of fiduciary duty claim because the trial court did not believe the claim survived Anton's death. Because this issue was resolved on summary judgment and involves interpretation of K.S.A. 60-1801, an agency agreement, and an agreement allegedly relieving Wrenick of fiduciary respon-

sibility, our review is unlimited. *LSF Franchise REO I v. Emporia Restaurants, Inc.,* 283 Kan. at 13, 19, 152 P.3d 34 (2007).

In determining that Jeanes' tort claim for breach of fiduciary duty did not survive Anton's death, the trial court determined that generally tort claims are personal in nature and do not survive the death of a decedent, citing *Nicholas v. Nicholas,* 277 Kan. 171, 188-92, 83 P.3d 214 (2004). The trial court determined that a breach of fiduciary duty claim was personal, relying on *Singer v. Dungan,* 45 F.3d 823, 827 (4th Cir. 1995). The *Singer* court stated that "a breach of fiduciary duty claim is personal in nature because it springs from the duty to deal honestly and fairly with fiduciaries." 45 F.3d at 827.

*Singer* involved a determination of what statute of limitations should be applied to a breach of fiduciary duty claim under Virginia law. The plaintiff in *Singer* argued for application of a 5-year statute of limitations for injury to his property based on dilution of his stock under a breach of fiduciary duty. The Fourth Circuit Court of Appeals determined that because a breach of fiduciary duty claim "springs from the duty to deal honestly and fairly with fiduciaries," the claim was personal in nature and subject to a 1-year statute of limitations. 45 F.3d at 827.

Nevertheless, Jeanes argues that Anton's breach of fiduciary duty claim was preserved under K.S.A. 60-1801. Moreover, because it is a remedial statute, Jeanes argues that it should be liberally construed in order to accomplish its purpose, citing *Mitchell v. Miller,* 27 Kan. App. 2d 666, 671, 8 P.3d 26 (2000). Jeanes further argues that Anton's personal estate was reduced by hundreds of thousands of dollars before her death due to Wrenick's breach of fiduciary duty. Moreover, Jeanes contends that the cause of action based from that breach of fiduciary duty survived because Anton's personal estate or property had been harmed.

In support of her argument, Jeanes cites *Lovejoy v. Bailey,* 214 Mass. 134, 101 N.E. 63 (1913), and *Holiday Properties Acquisition Corp. v. Lowrie,* 2003 WL 1040162 (Ohio App. 2003) (unpublished opinion). Nevertheless, Jeanes fails to explain how these two holdings are similar to this case.

In Kansas, where a fiduciary relationship exists between two parties, it is the duty of the person in whom confidence was placed to act with the utmost good faith and loyalty for the furtherance and advancement of the interests of his or her principal. *Stevens v. Jayhawk Realty Co.*, 9 Kan. App. 2d 338, 342, 677 P.2d 1019, *aff'd* 236 Kan. 90, 689 P.2d 786 (1984). While the allegation of breach of fiduciary duty here concerns the personal relationship between Wrenick and Anton, it would seem that the type of harm alleged before Anton's death would have constituted an injury to Anton's personal estate.

This alleged breach of fiduciary duty does not involve allegations of mental anguish or embarrassment that are difficult to quantify after the decedent's death, as was the invasion of privacy cause of action considered in *Nicholas*, 277 Kan. at 192. The *Nichols* court stated that " 'because the alleged injuries are so personal [in an invasion of privacy lawsuit], a jury would have to guess on the extent and nature of the decedent's emotional devastation, humiliation and ostracism without his presence and testimony at trial.' [Citation omitted.]" 277 Kan. at 192. Furthermore, *Nicholas* makes a telling point that an invasion of privacy claim must be brought by the person whose privacy was invaded. 277 Kan. at 191.

Similarly, whether a decedent's cause of action survives may depend on the type of harm or injury involved. In *Lowe v. Experian*, 340 F. Supp. 2d 1170, 1174-85 (D. Kan. 2004), the United States District Court for the District of Kansas applied K.S.A. 60-1801 to determine whether the plaintiff's negligence and tortious interference with business expectancy or relationship cause of action survived the plaintiff's death. The *Lowe* court determined that the real question of whether a decedent's cause of action survived depended on the type of harm or injury involved. If the decedent's claim was for injury to his or her real or personal property, then it would seem to have been a cause of action that would have survived at common law. 340 F. Supp. 2d at 1174-75. In *Lowe*, because the plaintiff had alleged that the defendant's actions caused damages to her reputation, the court found that the claim did not survive the plaintiff's death. 340 F. Supp. 2d at 1175.

The breach of fiduciary duty claim in this case would have involved a claim of an injury to Anton's personal property. K.S.A. 60-1801 states that actions for injury to the personal estate survive. Seemingly, the alleged over-charges of fiduciary fees would have been an injury to the personal estate. Consequently, we determine that the trial court erred in determining that the breach of fiduciary duty claim was personal in nature and, therefore, did not survive Anton's death.

Nevertheless, Wrenick argues that even if the breach of fiduciary duty claim survives, Jeanes could only recover damages accrued between the date of injury and death, citing *Mason v. Gerin Corp.*, 231 Kan. 718, 647 P.2d 1340 (1982). Moreover, Wrenick contends that Jeanes did not allege that Anton or her property was damaged while Anton was alive. Nevertheless, in arguing the survivability of this claim on appeal, Jeanes contends that Anton's "personal estate was reduced by hundreds of thousands of dollars before her death due to [Wrenick's] breach of fiduciary duty." Moreover, Jeanes later amended her petition to include claims of improperly charged fiduciary fees totaling $294,169.50 for the years 1991 through 2003. In reviewing the record, it would seem that the trial court did not consider whether any damages alleged from the breach of fiduciary duty claim accrued before Anton's death. Obviously, this lack of a finding in the record would require us to reverse and to remand this issue to the trial court for further proceedings.

Nevertheless, Wrenick argues, alternatively, that any fiduciary duty owed to Anton was extinguished by an agreement signed by Anton in which she directed the Bank to retain her Exxon Mobil stock. Before we can address this issue, we need to set out some additional facts explaining the parties' relationship with one another.

On June 13, 1991, Anton created a living trust agreement entitled the "Maxine J. Anton Living Trust." Anton was the grantor of her living trust and appointed herself and served as the sole trustee of the living trust from its inception to her death. Jeanes was sole beneficiary of the living trust.

On July 5, 1991, Anton, as trustee of her trust, entered into a written agency agreement with Bank IV Topeka, N.A., the pred-

ecessor of Bank of America, N.A. The agency agreement stated that Anton was the "principal" under the agreement and that the Bank was the "agent." The agency agreement was signed by Anton and Bank IV. Wrenick did not sign the agency agreement. The agency agreement stated in Article III that the Bank was to charge a fee for various described services "in accordance with the schedule agreed upon by the Principal and Agent in writing."

Under the agency agreement, Anton, as trustee, served as the principal and the Bank served as agent for the trustee. The agency agreement stated specific duties and responsibilities of the Bank as agent of the trustee of the trust. Each of those duties were expressly subject to Anton's prior authorization. Under the agency agreement, the Bank over the years performed certain tasks for Anton, including the collection and depositing into her bank account with the Bank dividends, interest, and other income from the stock holdings in the living trust; collection and depositing in her bank account of proceeds from sales of those assets as directed by her; and the payment from that account of Anton's bills, debts, and similar obligations (such as charitable donations) when bills or directions were received from her or from her designated representative.

In addition, subject to Anton's previous authorization, the agency agreement authorized the Bank "to do all things necessary for the care, preservation, management, protection, investment and reinvestment of" all property held in the agency account.

On November 20, 2000, Anton signed an agreement entitled "Direction by Grantor/Beneficiary to Retain Asset," in which she directed the Bank to retain in its custody her entire Exxon Mobil stock holdings. This agreement expressly stated: "I [Maxine Anton] hereby direct the Bank to purchase, sell or retain indefinitely in this account the described investment(s) until I give written direction to the contrary." The agreement separately described the investment involved as Anton's Exxon Mobil stock and separately stated her direction was to "retain" that stock in her account with the Bank.

Anton also agreed to the following: "I understand and agree that the Bank will have no fiduciary responsibility for such assets . . . retained in accordance with my directions hereunder."

Further, in the agreement, Anton agreed to the following: "I also understand and agree that, as long as the direction to retain an asset remains in effect the Bank will not perform investment reviews of such asset(s) and will have no responsibility to advise me or any other party whether to retain or sell such asset(s)." Moreover, the agreement indemnified, released, and held harmless the Bank and its officers, employees, and agents (of which Wrenick was one) with respect to the handling of her Exxon Mobil stock:

"On behalf of myself, my heirs, successors, and assigns, I hereby indemnify, release and hold harmless said Bank, its directors, officers, employees, agents, successor and assigns from any and all liability, claims, losses, and expenses, including attorney fees, which I or they may suffer as a result of following my directions."

Given this agreement, it would seem that Anton expressly relieved the Bank and Wrenick from analyzing and monitoring her Exxon Mobil stock holdings.

Jeanes, however, points out in her reply brief that while a party may contract away responsibility for its own negligence, an agreement seeking to protect a party from liability for its own negligence is subject to strict construction and will not be enforced unless the protection from liability is expressed in clear and unequivocal terms. Furthermore, contracts that attempt to exempt a party from liability for negligence are not favored by the law and are strictly construed against the party relying on them. See *Johnson v. Board of Pratt County Comm'rs*, 259 Kan. 305, 328-29, 913 P.2d 119 (1996) (citing *Zenda Grain & Supply Co. v. Farmland Industries, Inc.*, 20 Kan. App. 2d 728, Syl. ¶¶ 1-2, 894 P.2d 881, *rev. denied* 257 Kan. 1097 [1995]).

In addition, Jeanes points out that the agreement is devoid of any language relating to the Bank or Wrenick's duties to advise Anton on estate and tax planning matters. While it would seem that the agreement relieved the Bank and Wrenick from any responsibility for analyzing and monitoring the Exxon Mobil stock, the agreement did not expressly relieve the Bank or Wrenick from any responsibility to advise Anton about estate and tax planning matters, which would have helped preserve her estate upon her death.

We note a clear distinction between the analyzing and monitoring the Exxon Mobil stock and the alleged failure to give estate

and tax planning advice. It would seem that the language of the exculpatory agreement relieved the Bank and Wrenick only from analyzing and monitoring the Exxon Mobil stock. Because an issue of fact exists as to whether Wrenick was relieved of his fiduciary responsibility regarding estate and tax planning advice, it would be improper for us to grant summary judgment on Wrenick's alternative theory.

For the foregoing reasons, we reverse and remand to the trial court to determine whether any damages alleged from the breach of fiduciary duty claim accrued before Anton's death. Moreover, if any such damages had accrued before Anton's death, the trial court is directed to determine whether Anton's personal estate was injured by those damages, which would allow them to survive her death under K.S.A. 60-1801.

*Did the trial court err in dismissing the remaining claims against Wrenick?*

Finally, Jeanes argues that the trial court erred in dismissing her breach of express or implied contract claim against Wrenick because he was a disclosed agent for a known principal. Jeanes alleges a breach of an express or implied contract against Wrenick for his alleged failure to furnish and to implement certain estate planning advice to Anton during her life. Jeanes also alleges that Wrenick is personally liable for an overcharge by the Bank of fees due under the agency agreement. To the extent the resolution of these issues require interpretation of an agreement, this court's review is unlimited. See *LSF Franchise REO I,* 283 Kan. at 19; *Botkin v. Security State Bank,* 281 Kan. 243, 248, 130 P.3d 92 (2006).

In making her argument, Jeanes, however, does not address the issue of whether Wrenick can be held liable, first, on a contract to which he was not a party or a signatory, and, second, on any implied contract where his agency for the Bank was disclosed to or otherwise known by Anton.

The trial court granted Wrenick's motion for summary judgment, holding that "the record reveals no evidence that Rudy Wrenick was a party to the express and/or implied contract between Maxine Anton and Bank of America, N.A." Moreover, the

court reasoned that because Wrenick "was acting as 'a disclosed agent [of the Bank of America]' at all relevant times," he was not personally liable to the decedent for any breach of the contract between Bank of America and the decedent.

Here, the Bank of America entered into an express contract with Anton. After the creation of her living trust, Anton, as trustee of her trust, entered into a written agency agreement on July 5, 1991, with Bank IV Topeka, N.A., the predecessor of Bank of America, N.A. Under the agency agreement, Anton, as trustee, served as the principal and the Bank served as agent for the trustee. Wrenick was not a party to that contract. He did not sign it. Jeanes does not suggest that Wrenick was a party to any express contract with Anton. Thus, summary judgment was appropriate on any claim of breach of an express contract by Wrenick.

In addition, Jeanes argues, in the alternative, that Wrenick breached an implied contract to furnish estate planning advice to Anton. The record shows that Wrenick acted as an officer and employee of Bank of America, N.A., and its predecessors, Bank IV and NationsBank, and held the title of president of the Topeka branch of the Bank. Throughout his tenure as the bank employee assigned to Anton's account with the Bank, Wrenick clearly disclosed his agency on behalf of the Bank to Anton.

The law of Kansas is unequivocal that "[w]here the other party [to a contract] has actual knowledge of the agency and the identity of the principal, the agent will be relieved from liability, whether he himself makes the disclosure or the other party acquires the knowledge from some other source. [Citation omitted.]" *Lentz Plumbing Co. v. Fee,* 235 Kan. 266, 271, 679 P.2d 736 (1984). Stated another way, a company officer escapes personal liability under a contract entered into with third persons on behalf of a corporation if the third person is aware of the corporation's existence. *Hill & Company, Inc. v. O'Malley,* 15 Kan. App. 2d 709, 713, 817 P.2d 660 (1991) (citing *Lentz Plumbing,* 235 Kan. at 271). The company officer or agent must disclose the fact of the agency and the identity of the principal in order to escape personal liability. See *Bruce v. Smith,* 204 Kan. 473, 476, 464 P.2d 224 (1970). The record before the trial court demonstrated that both Wrenick and

the Bank disclosed to Anton that Wrenick was an agent of the Bank. As a result, summary judgment in favor of Wrenick was appropriate on Jeanes' claim of breach of an implied contract.

Affirmed in part, reversed in part, and remanded with directions to the trial court for further proceedings.